IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LINDA HARKNESS, | : | |
|     Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | No. 19-5245 |
| | : | |
|     Defendant. | : | |

**MEMORANDUM OPINION**

TIMOTHY R. RICE                                                                                                                                  June 15, 2020
U.S. MAGISTRATE JUDGE

      Plaintiff Linda Harkness alleges the Administrative Law Judge ("ALJ") erred in denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") in several ways, including that the limitations in the Residual Functional Capacity (RFC) assessment[1] are not supported with substantial evidence. Pl. Br. (doc. 12) at 10. Because the ALJ failed to support the RFC's mental limitations with substantial evidence, I remand the case for additional consideration.[2]

      Harkness filed for benefits based on a combination of physical and mental impairments in March 2017. R. at 128. Her claims on appeal, however, focus solely on her mental impairments. Pl. Br. at 9-10. At her ALJ hearing, Harkness explained that she suffers from auditory hallucinations. R. at 17-18. The voices she hears fuel paranoia by telling her those around her

---

[1]     A claimant's RFC reflects "the most [she] can still do [in a work setting] despite [her] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a).

[2]     Harkness consented to my jurisdiction on December 20, 2019 (doc. 9), pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 72, Local Rule 72.1, and Standing Order, In re Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018). See also Roell v. Withrow, 538 U.S. 580, 584 (2003) (consent to Magistrate Judge jurisdiction can be inferred from failure to object after notice and opportunity).

plan to hurt her and instructing her to hurt them first.  Id.  She testified the voices commanded her to use a hand scanner to hit her colleagues when she worked in an Amazon warehouse, stab her colleagues when she worked at a Crayola factory, and swerve her car into others when she drove, although she had never carried out their instructions.  Id. at 64-65.  She testified that she carries a knife in her purse and sleeps with a knife next to her bed.  Id. at 68.

Although Harkness was able to work from 2006 to 2017, she has suffered from mental illness for most of her life, including multiple hospitalizations prior to 2011 for attempted suicide.  Id. at 454.  The medical record documents auditory hallucinations at least as early as April 2015, id. at 740-41, but also shows providers felt they were "manageable" when she regularly took the anti-psychotic medication Abilify, id. at 734-39.

The hallucinations intensified when Harkness came under increased stress, like when she started working at the Amazon factory in September 2015.  Id. at 732-33.  Nonetheless, she managed to hold that job until early 2017, when she was fired for arguing with a co-worker who had complained that Harkness was talking to herself.  Id. at 65.  The medical records show that Harkness had temporarily stopped seeing her psychiatrist in January 2017 due to a change in insurance benefits.  Id. at 416.  She worked at Crayola's crayon factory for a short period of time in 2017, but quit because she felt she would soon be compelled to hurt a co-worker.  Id. at 64.

The ALJ credited Harkness's reports of auditory hallucinations, but found they were not fully disabling based on the "longitudinal evidence of record" because medication allowed her to push her auditory hallucinations "into the background."  Id. at 25-26.  According to the ALJ, because Harkness's symptoms were "significantly decreased" with medication and therapy, she could perform routine and repetitive tasks that required judgment and occasional changes in a

routine work setting as long as she was limited to only occasional interaction with supervisors, colleagues, and the public. Id. at 17, 25. Based on Vocational Expert (VE) testimony, the ALJ found Harkness was able to perform the jobs she previously held in Crayola's crayon factory and Amazon's warehouse. Id. at 26.

In support of his analysis, the ALJ noted that Harkness: (1) had never acted on her violent impulses; (2) enjoyed engaging with her family; (3) was able to perform normal activities of daily living like household chores and using her computer to access Facebook; and (4) repeatedly had mental status examinations showing normal mood and affect and a cooperative attitude. Id. at 26. The ALJ was required to provide "substantial evidence" in support of his RFC. 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). Nonetheless, "[i]n making a residual functional capacity determination, the ALJ must consider all evidence before him," and provide "some indication of the evidence which he rejects and his reason(s) for discounting such evidence." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000). If the ALJ fails to explain why he rejected countervailing evidence, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir.1981).

The ALJ failed to support his RFC with substantial evidence. He appears to have credited Harkness's reports of command-type auditory hallucinations that instructed her to strike co-workers. R. at 26 ("Giving the claimant all benefit of the doubt"). This is only reasonable because the medical records repeatedly corroborate her testimony on this point. See, e.g., id. at 435, 730, 733, 743. Because she was fired from Amazon for arguing with coworkers before the

disputes became violent and left Crayola before she could succumb to violent impulses there, the lack of violent acts is not evidence that she could return to those jobs without being driven to the cusp of violence again.

The ALJ accurately noted Harkness was able to perform normal activities of daily living like household chores, using her computer, and accessing Facebook. Id. at 26. He failed to address, however, evidence that she was never able to perform these activities in normal ways. According to Harkness, she would regularly converse aloud with Facebook and the television. Id. at 76. She reported arguing with her daughter, who objected to having to listen to her mother interact with her auditory hallucinations just like her colleagues at the factory and warehouse objected when she spoke to herself aloud there. Id. at 75, 77, 79.

The ALJ found Harkness was able to return to work in the factory or warehouse because medical records showed she could push her auditory hallucinations "into the background" with medication and therapy. Id. at 25-26. At the same time some records showed Harkness could push her auditory hallucinations "into the background," however, those same providers also noted that she still needed to shop for groceries at night when the stores were less crowded. Id. at 782-83, 788. Even without the added stress of a full-time job and having made "excellent progress" in reducing her symptoms, medical records document that Harkness was instructed to wear headphones in order to complete her late-night grocery shopping independently. Id. at 782. Harkness's ability to perform the "normal" activities the ALJ cited, in the ways her records show she performed them, is not substantial evidence of her ability to return to a factory or warehouse setting full-time without significant accommodations which are not included in the RFC.

The ALJ accurately observed that Harkness's hallucinations improved when she regularly

took her medicine, but his RFC does not reflect an understanding of what an improved state looked like for Harkness.  For example, in summarizing the medical records for his Step Three analysis, the ALJ relied on the records of Harkness's psychiatrist to find Harkness experienced no auditory hallucinations in 2016, the year she worked at the Amazon warehouse.  Id. at 19.  The ALJ is correct that the specific psychiatric notes he cites do not document auditory hallucinations.  The "longitudinal record" he refers to, however, put those records in another context and suggest they likely meant only that she was experiencing no unusual auditory hallucinations or no hallucinations during the 15-minute medication management appointment because the contemporaneous therapeutic plans of that same provider show that the auditory hallucinations themselves never disappeared entirely.  Compare, e.g., R. at 433 (Cedar Point therapeutic plan showing October 2017 long-term goal was to reduce, not eliminate, hallucinations), 439 (Cedar Point November 2017 medication management record showing no hallucinations or psychosis and symptoms "under control"), and 431 (Cedar Point therapeutic plan showing February 2018 goal was to further reduce, not eliminate, hallucinations).  When read in its entirety, the "longitudinal record" referenced by the ALJ, id. at 25, shows that "in the background" meant just that, and that even medication compliance did not prevent Harkness's hallucinations from regularly returning to the foreground when she was forced to be around groups of people, id. at 431.

      The ALJ accurately noted that Harkness's medical records repeatedly reference her normal mood, affect, and cooperative attitude at her medical appointments.  Id. at 26.  These findings do not preclude auditory hallucinations in group settings.  Harkness testified that her condition worsened when her brother died in 2014; her work record supports this by showing a

single employer from 2006 through 2013 and frequent changes in employers from 2014 onwards. Id. at 67, 252.  She also testified her auditory hallucinations were less intrusive when she was working as a housekeeper because she spent most of her time alone.  Id. at 66.  The medical record supports Harkness's testimony that the presence of others exacerbates her condition. When she left the housekeeping field and began working in the Amazon warehouse in late 2015, her hallucinations immediately intensified.  Id. at 732-33.  By January 2016, her long-time auditory hallucinations had become, seemingly for the first time, "command type."  Id. at 702. Although the ALJ accurately noted that some of Harkness's medical records suggested her condition was stable throughout 2016, id. at 704-25, he failed to explain how he reconciled those with others that showed continuing psychosis and increasing paranoia, id. at 742-43.

      The ALJ limited Harkness to only occasional interaction with supervisors, colleagues, and the public, and the VE testified her former positions at Crayola and Amazon met that criteria.  Id. at 90.  The medical record clearly demonstrates, however, that it is not just interaction that exacerbates Harkness's symptoms, but the mere presence of large groups of other people.  Id. at 61 (never shops in retail stores or attends church), 68 (voices start with three or more people), 431 (February 2018 treatment plan noting that homicidal ideation occurs when Harkness is in groups and recedes when she is cooking), 779 (February 2019 treatment plan notes auditory hallucinations quadruple in volume when she is around groups of people), 782 (November 2018 medical record noting that Harkness sometimes must abandon groceries in the cart and leave the store when too many people are at the checkout counter).  The ALJ failed to explain how an individual whose symptoms are considered "stable" and "under control" only when she can shop in grocery stores late at night while wearing headphones can endure even

occasional interaction with supervisors, coworkers, and the public, let alone a factory or warehouse setting.  See, e.g., id. at 69 (VE testimony that individuals who repeatedly speak aloud to themselves cannot maintain employment in a warehouse or factory).

There may be positions sufficiently solitary to accommodate Harkness's mental impairments, but I am prohibited from re-weighing the evidence and filling in reasoning the ALJ failed to provide.  Louis v. Comm'r Soc. Sec., No. 19-2575, 2020 WL 1867931, at *1 (3d Cir. Apr. 14, 2020) (citing Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011)); Cortes v. Comm'r of Soc. Sec., 255 F. App'x 646, 653 n.6 (3d Cir. 2007).  Because the ALJ failed to address evidence showing the two jobs she performed previously worsened her psychosis, he failed to provide substantial evidence that she could return to those positions. Harkness's claim must be remanded for further consideration.[3]

An appropriate Order accompanies this opinion.

---

[3] Because I am remanding this case based on the ALJ's errors with respect to the RFC, it is unnecessary to address Harkness's additional claims.  See Steininger v. Barnhart, No. 04-5383, 2005 WL 2077375, at *4 (E.D. Pa. Aug, 24, 2005) (not addressing additional arguments because ALJ may reverse his findings after remand).